UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Pamela T., | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 18 CV 50173 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**[1]

This is a Social Security disability benefits appeal. Plaintiff, who is now 45 years old, has a limited work history, having worked only sporadically in two jobs. Although she suffers from some physical impairments (left knee arthritis, carpal tunnel syndrome, and obesity), her mental impairments are the sole focus of this appeal. She has been diagnosed with major depressive disorder, generalized anxiety disorder, obsessive compulsive disorder, post-traumatic stress disorder, and borderline personality disorder. The administrative law judge ("ALJ") found these impairments were severe at Step Two, but concluded that plaintiff could still work.

In reviewing the briefs, the Court is presented at the outset with two starkly different portrayals of plaintiff, both ostensibly derived from the same evidentiary record. An initial overview will show just how far apart they are. According to plaintiff's lawyers, she was an abrasive and contentious person who has repeatedly gotten into tangles (and more pronounced conflicts) with a broad range of people, including customers at work, medical personnel, and family members. She has a history of severe mood swings and dysfunctional behavior and is

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.

1

reluctant to go into public places, is fearful of germs, and often sees strangers as angels or demons. She alleges that her main problem is emotional.

Looking at the same record, the ALJ saw a different person. According to the ALJ, plaintiff was a cooperative person, whose mental problems were manageable, as confirmed by normal examination findings, such as her intact memory and logical thought processes. The ALJ believed plaintiff's periodic difficulties were caused by her failure to take her medications consistently. In short, the ALJ concluded that plaintiff was not a credible witness. Relying on the testimony of the vocational expert, the ALJ concluded that plaintiff was capable of working as a hotel housekeeper, small products assembler, or sales attendant. The premise underlying the ALJ's analysis is that plaintiff's problem is mainly cognitive or intellectual, not emotional.

In their briefs, the parties argue over several specific legal questions arising out of the complex legal framework governing Social Security disability decisions. For example, the parties argue whether plaintiff had marked, as opposed to moderate limitations, in the Paragraph B criteria considered in the analysis of the Section 12 listings. Another question debated in the briefs is whether the ALJ should have included an RFC limitation for one-to-two step tasks.

The Court concludes, however, that it need not resolve these more technical questions because a remand is justified for the more basic reason that the ALJ relied too heavily on cherrypicking, resulting in a one-sided portrayal that was not based on a fair review of the record. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ "misstated some important evidence and misunderstood the import of other evidence"); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not rely on "errors of fact or logic"). It is one thing to make an open choice between two reasonable interpretations, but it is a different

matter to ignore critical lines of evidence without even acknowledging them. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

In her two briefs, plaintiff identifies a number of instances of cherrypicking. The Court finds that these arguments are, for the most part, persuasive and well-made. The Court will not go through every instance of cherrypicking, as the following examples are enough to move this case across the remand threshold.

Plaintiff's cherrypicking arguments are largely tied to the ALJ's main findings. As summarized by the Government, the ALJ relied on six main findings: (1) "plaintiff was able to perform serial sevens upon examination"; (2) "her memory was primarily considered intact by evaluators"; (3) "she was found to be cooperative with doctors and even friendly"; (4) "both consultative examiners found that plaintiff would be able to manage benefits, if awarded"; (5) "plaintiff reported that she was able to pay bills, count change, manage a savings account and handle checkbook/money orders"; and (6) "plaintiff was often not compliant with prescribed treatment." Dkt. #31 at 14-15.

The Court will start with the first finding—the passing of the serial sevens test. This test, which requires a person to count backward from 100 by sevens, "is a clinical test used to test mental function; for example, to help assess mental status after possible head injury or in suspected cases of dementia." *See* "Serial Sevens," *Wikipedia,* https://en.wikipedia.org/wiki/Serial_sevens (last visited Feb. 4, 2020). The ALJ stated, straightforwardly and unqualifiedly, that plaintiff had passed this particular test. In fact, the ALJ mentioned this fact several times, relying on it in both the credibility analysis and in the medical opinion analysis. *See* R. 27, 28. It was the first reason mentioned in the list of six findings

summarized by the Government. All this suggests that this seemingly simple test was nonetheless viewed as a significant piece of evidence.

Although the ALJ did not state specifically who made the finding that plaintiff passed this test, the ALJ's citation indicates that it was Dr. Ramchandani, one of two consultative examiners who examined plaintiff in June 2015. Exs. 2F and 3F. Dr. Ramchandani's focus was on plaintiff's physical impairments. A different consultative examiner, psychologist Julie Harris, examined plaintiff's psychological impairments. The ALJ's reliance on the serial sevens test is misleading and problematic because, although Dr. Ramchandani did find that plaintiff passed this test, the ALJ did not acknowledge that plaintiff did *not* pass the test when it was performed by Dr. Harris. Specifically, in her report, Dr. Harris wrote:

> When asked to count backward from 100 by 7's, [plaintiff] said, "Oh Hell! 93 (delay), 87, 80, 73, and 64."

R. 326. Although Dr. Harris did not explicitly state that plaintiff did not pass this test, it is clear from this statement, as plaintiff argues, that plaintiff "made an error on just the second calculation in the series and then another error two steps later." Dkt. #35 at 8. The failure of the ALJ to acknowledge this failed test, while relying heavily on another successful test, is a classic example of cherrypicking. *See, e.g., Bole v. Berryhill*, No. 16-CV-1230, 2018 WL 1257811, *3 (E.D. Wisc. Mar. 12, 2018) ("The ALJ also failed to acknowledge that during a more recent assessment, [the claimant] was unable to perform the serial sevens."); *Mitchell v. Colvin,* No. 13 CV 50209, 2015 WL 5227411, *5 (N.D. Ill. Sept. 8, 2015) (criticizing the ALJ for not considering all the serial sevens findings).

Another finding that rests on shaky factual grounds is the claim that plaintiff was cooperative with her doctors. *See* R. 22 ("claimant was primarily described as cooperative by doctors and at one point was even described as friendly."). This finding goes to the heart of

plaintiff's case, which is her claim that she had severe problems with social interaction. Plaintiff argues that the ALJ's conclusion ignores a "plethora" of contrary evidence. This Court agrees.

Perhaps the best evidence comes from Dr. Harris, who provided a detailed report. One of her major conclusions was that plaintiff's personality was "abrasive." R. 323. Here is a longer description:

> The claimant presented as dramatic and entitled and frequently swore in the current evaluation. Her personality was abrasive, loud and animated. She has a history of non-compliance and interpersonal conflict. She has a history of treatment non-compliance and interpersonal conflict. In the evaluation, her affect was labile—she was never tearful, but was observed laughing or angry.

R. 326. The conclusion that plaintiff was "dramatic" and "entitled" fits with the diagnosis of a personality disorder, according to Dr. Harris, and is strongly at odds with the ALJ's suggestions that plaintiff was cooperative and friendly with medical personnel. The ALJ omitted these findings in her decision. However, the ALJ did cite to the Harris report as evidence *supporting* the ALJ's conclusion. The ALJ seized upon one sentence in the report that refers to plaintiff as being "cooperative." However, this brief reference is misleading because the ALJ basically airlifted this one word from its textual surroundings. Here is the sentence in question: "She was cooperative, but appeared dramatic and animated." R. 323. The ALJ chopped off the sentence at the word "but," rewriting it to create a different impression. When read fairly and in its entirety, the Harris report offers little support for the ALJ's thesis that plaintiff was cooperative in a way that would allow her to work as, for example, a sales attendant.

The ALJ engaged in a similar form of cherrypicking when citing to the treatment notes of Kimberly Mattei, a nurse at the Crusader Clinic. The ALJ cited to her notes from October 30, 2015 to support the conclusion that plaintiff was a cooperative person. R. 22. But the ALJ again extracted a misrepresentative nugget. Here is the passage the ALJ relied on:

5

> BEHAVIOR: Irritable initially but did calm down. Frustrated with the wait time and said the staff was loud and unprofessional. Cooperative, friendly, Good eye contact.

R. 475. Although it is true that the word "cooperative" was used, the longer quotation again casts doubt on the ALJ's simplistic takeaway. The more specific references to plaintiff being irritable and frustrated and to plaintiff accusing the staff of being "loud and unprofessional" seem to provide more support for plaintiff's theory.[2]

In addition to this evidence, which the ALJ affirmatively relied on even though it didn't really support the ALJ's theory, there is also the evidence that the ALJ overlooked or downplayed. Plaintiff testified that she had a lifelong problem in getting along with others. This testimony included the following: she had a history of fighting in school; when she worked for six months as a bill collector, she "frequently cussed customers out"; she worked as a hair braider but stopped because she "didn't want to deal with anyone"; she was arrested in 2000 for domestic battery with a weapon; and she was dropped from Crusader Clinic because she "cussed her treatment provider out." R. 324-25. The ALJ ignored this evidence.

Another area where the ALJ engaged in cherrypicking, according to plaintiff, is in assessing her daily activities. Plaintiff argues that the ALJ relied on an "isolated report" to support the conclusion that plaintiff was able to take care of personal hygiene and do tasks around the house on her own. The isolated report is Dr. Ramchandani's report. It does include this sentence, which the ALJ relied on: "[Plaintiff] is able to take care of personal hygiene, showers and changes clothes unassisted, eats meal [sic] on her own and does not use any assistance device." R. 329. Plaintiff argues that this characterization is undermined by "every

---

[2] These same notes contain other statements supporting plaintiff. *See* R. 474 ("Says the smallest things 'piss' her off. Says she has a tendency to be violent.") ("Emotional responses are dramatic and out of proportion to the circumstances") ("triggered by germs, driving, public places"); R. 475 ("charges dropped for attempting to stab ex boyfriend—self defense").

6

other report in the record" showing that she "does minimal chores" and that "her children do most of the work." Dkt. #18 at 11. After reviewing the evidence, the Court agrees that there was enough contrary evidence about plaintiff's daily activities that the ALJ should have confronted it more directly. For example, plaintiff testified that her adult children did not let her cook and took her knives because they were worried about her hurting herself due to a "history of threatening self-harm." Dkt. #18 at 11; R. 49 ("[S]o the kids won't let me cook. They took all [] the sharp knives. [] I got plastic forks."). Her children did the cleaning and laundry. R. 50. She testified that she has difficulty getting off the toilet. R. 53. She testified that the last time she went grocery shopping was at Halloween (the hearing took place in February) and that she was only able to go that time at 3:00 a.m. and then "almost passed out" at the checkout line due to her fear of people. R. 50.

But even if we were to confine the analysis to the Ramchandani report, as the ALJ mostly did, then there is still a concern about cherrypicking. The ALJ relied on the sentence quoted above in which plaintiff self-reported that she could take care of her hygiene and eat meals on her own. However, the ALJ ignored other self-reported statements from this same report—for example, the following:

> [Plaintiff] gives history of OCD, anxiety disorder and depression for 2 years. He [sic] feels sad, depressed and cries for no reason and sleeps only 2 hours at a stretch. She does not like crowds, prefers to stay at home, hears unintelligible voices, sees demons, does not have friends and interacts with family only.

R. 329. As plaintiff argues in her reply, "even if [she] were able to take care of personal hygiene, change clothes, and eat meals on her own, it is unclear how this illustrates only moderate limitation given that *in that same examination* she reported sleeping for only 2 hours at a stretch, does not like crowds, prefers to stay at home, hears unintelligible voices, sees demons, does not have friends and interacts with family only. Why does the ALJ credit one aspect of her self-

7

reporting and not the other in the context of the same examination?" Dkt. #35 at 3 (emphasis in original; internal citation omitted). This argument is convincing and needs no further elaboration.

Consider another example of cherrypicking from within a single document. The ALJ reviewed Dr. Jafry's treatment notes from June 6, 2016, but found only the following observation to be relevant: "Thought process: linear." R. 22 (citing R. 440). This fact supported the ALJ's finding that plaintiff's thought processes were normal, which in turn supported the ALJ's larger conclusion that plaintiff was not credible. However, the ALJ again omitted many other contrary facts from this same document. For example, here is a screenshot of one portion of these notes:

> History of Present Illness:42 y/o AAF prev client of JWC , :feel depressed anxious , anger issues for long time, long hx of mood swings anger gets physical (hit her daughter yesterday ) sleep poor racing thoughts flashback nightmares of sexual abuse by step dad ,impulsive agitated feel depressed cry anxious around people , AH + bad & good stuff VH  demons & spirits  (today also )paranoia of being watched NO ST NO HT no plans or intents (MHA) no meds x april 2016
>
> Pertinent Past History
> Reviewed the client's history from the Mental Health Assessment dated: 6/6/16  with no changes or as updated below.
> Past Psychiatric History:  no admission, suiicde attempt 3-4 last xamss DOD
> Past Medical History: obese

R. 439. There is a lot in this excerpt—*e.g.* that plaintiff hit her daughter, that she suffered from sexual abuse from her step-dad, and that she had attempted suicide—which cuts against the ALJ's thesis. The Court recognizes that many of these statements are self-reports, but Dr. Jafry did not suggest that they were untrue or that plaintiff was malingering and, as noted above, the ALJ selectively relied on self-reports as well.

In sum, these cherrypicking examples justify a remand. Additionally, plaintiff has raised legitimate concerns about doctor playing. *See Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018) ("ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves."). Plaintiff argues generally that the ALJ's analysis reflects a

"misunderstanding of mental illness in general." Dkt. #18 at 11. Plaintiff also faults the Government for making similar flawed assumptions. Plaintiff points to several areas of concern.

First, plaintiff argues that the ALJ placed too much weight on normal findings but overlooked the possibility that she, like many people with mental illnesses, had periods where she appeared normal. *See Byndum v. Berryhill*, No. 17 C 01452, 2017 WL 6759024, *5 (N.D. Ill. Dec. 15, 2017) ("the ALJ's opinion does not reflect an understanding that a person under treatment for a chronic disease, whether physical or psychiatric, is likely to have 'better days and worse days' and symptoms that 'wax and wane.'").

Second, and related to the first point, the Government criticizes plaintiff for "mostly citing to her own self-reports." Dkt. #31 at 4, 5. But this criticism ignores the fact that self-reports should not automatically be dismissed as untrustworthy. *See Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("Whatever uncertainty may exist around such self-reports is not by itself reason to discount them—otherwise, why ask in the first place?"); *Korzeniewski v. Colvin*, No. 12 C 6895, 2014 WL 1457854, *7 (N.D. Ill. Apr. 14, 2014) ("All diagnoses, particularly those involving mental health conditions, require consideration of the claimant's subjective symptoms.").

Third, the ALJ found that plaintiff was not credible because she was "often" not compliant with "prescribed treatment." R. 27. However, the ALJ failed to consider possible explanations for this fact. As plaintiff argues, her mental impairments may have prevented her from adhering to treatment recommendations. The Seventh Circuit has made this point in many cases. *See, e.g. Voigt v. Colvin*, 781 F.3d 871, 877 (7th Cir. 2015) ("Nor did [the ALJ] note the natural reluctance of a person with psychiatric problems (perhaps of any person) to take powerful pain medications, as they can have serious side effects if not carefully used."); *Spiva v. Astrue*,

9

628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications.").

Here, plaintiff testified to facts which, if believed, might fit within this case law. Consider the following colloquy with the ALJ:

> Q  And why did you stop going to Rosecrance?
>
> A  Ma'am, you can go inside Rosecrance right now, and they going to look at you and frown like they mad because you're there. Those people are not kind and they're inconsiderate of people's feelings. And I'm not going there. I told my doctor I'm [not] going back there. And I called Dr. [Jafry], and told why I'm not coming back there. I gave them three different chances on three different—just three different chances and I can't do it. I'm not going there.
>
> Q  Did you have issues with the therapist that you were meeting with, or just the whole—sorry?
>
> A  Chris—the first time I went, I had Chris Tripp [PHONETIC], and you walk into his office. He got the lights off. Why is the lights off, you know. We're here for a meeting, and you got the lights off. Are you rushing me off, you know. So me and him didn't click, you know, in the beginning. So I asked for a new therapist. They wouldn't give me a new therapist so I left them alone the first time. The second time I went, they gave me Chris Tripp again. And this time he had [an] attitude with me, and I know he had [an] attitude because he would just sit there. So I mean why am I going. I'm—I stopped going. And then when they want you to go into the meetings, they have groups and meetings. It's like 30 of you guys, and they want you to talk about your business in front of all them. I'm not doing that either. So Rosecrance is not a fit for Pam. I'm sorry.

R. 45-46. The ALJ did not refer to this evidence in the opinion, nor otherwise consider the larger possibility that plaintiff's mental problems, including her borderline personality disorder, made it hard for her to take advantage of treatment such as counseling.

Fourth, plaintiff complains that the ALJ failed to seriously consider the "[m]ultiple times in the record" where she reported seeing people as angels and demons. Dkt. #18 at 10 (citing to R. 275, 329, 411, 435, 439, 468, 475. 478); *see, e.g.,* R. 475 (plaintiff: "bad people have red hot

10

faces like the devil and good people have bright glowing faces of angels"). This issue does not fit neatly into the doctor playing category and arguably could be cited as an example of cherrypicking. Either way, it is an issue that needs more analysis. The ALJ dismissed this whole line of evidence based on the following statement in Dr. Harris's report: "There is a history of visual hallucinations, but when she described them in the evaluation, she appeared to have perceptions of people she does not like as demons. It is not the evaluator's opinion that these are actual hallucinations."[3] R. 327. Given that Dr. Harris did provide support for the ALJ's conclusion that these were not "actual" hallucinations, the ALJ was not strictly playing doctor. Still, this rationale is not satisfying because it does not fully address the allegation that plaintiff was seeing demons and angels. Was the ALJ indirectly suggesting that plaintiff was malingering? The ALJ never explicitly said so. In any event, even if these thoughts did not rise to the technical level of an "actual hallucinations" (however that is defined), these thoughts still could affect plaintiff's ability to get along with co-workers and supervisors. This is an area that could benefit from additional expert analysis.

In conclusion, the Court finds that a remand is required on the basic grounds that the ALJ engaged in too much cherrypicking and doctor playing and that these flaws have clouded the factual picture, making it difficult to assess the remaining legal questions. As Judge Cole has observed, ALJs and judges "are not required to leave their common sense and experience at the hearing room or courthouse door." *Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, *11 (N.D. Ill. Oct. 29, 2014). Taking a common sense perspective here, it seems doubtful that a person with an abrasive personality, who has a history of cussing people out and a fear of germs, would work well as a sales attendant, a job typically requiring interaction with customers. At the

---

[3] Dr. Harris did not provide an explanation for why she reached this conclusion.

same time, the Court acknowledges that the ALJ did not find that plaintiff's testimony was fully credible. But assessing credibility in cases such as this one, where the claimant has personality disorder, is complicated. *See Sanchez v. Berryhill*, No. 16 CV 50309, 2017 WL 6988656, *5 (N.D. Ill. Dec. 19, 2017) (because one feature of antisocial personality disorder is deceitfulness, this "creates a potentially tricky catch-22 situation when assessing credibility," which is a good reason for calling a psychological expert). The ALJ should call a psychological expert on remand.

## CONCLUSION

For the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is reversed and remanded for further proceedings.

Date: February 4, 2020          By: _____
                                    Lisa A. Jensen
                                    United States Magistrate Judge